**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**RUSSELL JONES,**

      **Plaintiff,**

**v.**                                    **Case No.: 1:16-cv-09051**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court is Plaintiff's Motion for Summary Judgment and Defendant's Motion for Judgment on the Pleadings, as articulated in their memoranda. (ECF Nos. 14, 15).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT**

Plaintiff's Motion for Summary Judgment, (ECF No. 13), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 15); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

## I.   <u>Procedural History</u>

On January 31, 2013, Plaintiff Russell Jones ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of July 1, 2009, (Tr. at 206-18), due to "[n]erve problems, osteoarthritis in right knee, depression, OCD, and back disc disease and arthritis." (Tr. at 231). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 12). Claimant filed a request for an administrative hearing, which was held on December 9, 2014 before the Honorable Anne Sprague, Administrative Law Judge ("ALJ"). (Tr. at 26-50). At the hearing, Claimant amended his alleged onset date to August 20, 2013. (Tr. at 12). By written decision dated February 26, 2015, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 12-25). The ALJ's decision became the final decision of the Commissioner on August 25, 2016, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 10, 11). Claimant then filed a Motion for Summary Judgment and Memorandum in Support. (ECF Nos. 13, 14). In response, the Commissioner filed a Brief in Support of

Defendant's Decision. (ECF No. 15). The time period within which Claimant could file a reply memorandum is expired. Consequently, the matter is fully briefed and ready for resolution.

**II.    Claimant's Background**

Claimant was 51 years old at the time of his amended alleged onset of disability, and 52 years old at the time of the ALJ's decision. (Tr. at 12, 19). He has the equivalent of a high school education and communicates in English. (Tr. at 230, 232). Claimant previously worked as a custodian, maintenance worker, counter clerk, candy packer, and delivery driver. (Tr. at 45-46, 232).

**III.    Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a

3

claimant's] physical or mental ability to do basic work activities." *Id*. If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review

performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents her findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through September 30, 2014. (Tr. at 15, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since August 20, 2013, the amended alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: osteoarthritis of the right knee, degenerative disc disease, depression, and anxiety. (*Id.*, Finding No. 3).

As for the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 15-16, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant would be limited to frequently climbing stairs and occasionally climbing ladders, balancing, and crawling. He should avoid dangerous equipment, extreme heat, and operating heavy machinery. He could perform simple tasks with no public interaction and only occasional interaction with coworkers or supervisors.

(Tr. at 16, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any of his past relevant work. (Tr. at 18, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial

gainful activity. (Tr. at 19-20, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1962, and was defined as an individual closely approaching advanced age on the alleged disability onset date; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 19, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including unskilled work as an assembler, packer, or inspector at the light exertional level. (Tr. at 19-20, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled and was not entitled to benefits. (Tr. at 20, Finding No. 11).

## IV.    Claimant's Challenges to the Commissioner's Decision

Claimant raises two primary challenges to the Commissioner's decision. First, Claimant argues that the "ALJ failed to adequately evaluate all relevant evidence of record and provide adequate explanation of such evaluation" regarding his mental impairments. (ECF No. 14 at 13). He states that the ALJ focused on a single evaluation on September 6, 2013 and "failed to consider" the rest of his over four years of mental health treatment, including notes that his medications were offering him little or no benefit despite the fact that multiple medications were tried over the years. (*Id.* at 14). He further argues that the ALJ erred in her analysis of Claimant's consultative psychological evaluation by David Lawson, M.A. (*Id.* at 15). Claimant argues that the ALJ incorrectly discredited Mr. Lawson's opinions on the basis that he was not an "acceptable medical source." (*Id.*). Also, Claimant contends that the ALJ provided

insufficient explanation in finding that Mr. Lawson's opinions were not supported by objective medical evidence in the file without explaining or identifying what evidence was contrary to Mr. Lawson's opinions. (*Id.* at 16). Finally, with respect to his mental impairments, Claimant challenges the ALJ's analysis of the "paragraph B" criteria.[1] He contends that the ALJ overstated his activities and functions, which he actually could only perform sporadically and in limited duration. (*Id.* at 19). Also, Claimant argues that the ALJ utilized Mr. Lawson's testing, yet reached conclusions contrary to those of Mr. Lawson, which Claimant states shows that the ALJ improperly substituted her non-medical judgment for that of an accepted medical source. (*Id.*).

In his second challenge to the Commissioner's decision, Claimant contends that the ALJ's analysis of his right knee impairments is "grossly deficient." (*Id.* at 17). He argues that the ALJ's finding that Claimant's pain and range of motion improved with injections is not supported by substantial evidence because the notes in the record "make clear that the improvements provided by those injections were of limited duration, lasting at most a couple of months." (*Id.*). Therefore, Claimant states that there is no evidence to indicate that the injections provided him relief on an ongoing basis sufficient to permit long-term work activities. (*Id.*). Further, Claimant challenges the fact that the ALJ did not even acknowledge that three specialists, including an orthopedist and two rheumatologists, found that Claimant's knee condition deteriorated to the point that a knee replacement was recommended. Furthermore, the ALJ did not acknowledge Claimant's use of a cane. (*Id.* at 17-18).

---

[1] The functional areas included in the paragraph B criteria are activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation of extended duration.

In response, the Commissioner argues that substantial evidence supports the ALJ's analysis of the medical evidence of record regarding Claimant's mental and physical impairments, including the fact that Claimant failed to meet his burden of showing that he met the "paragraph B" criteria under the Listing for mental impairments, the ALJ sufficiently considered the evidence of record regarding Claimant's psychological impairments, and the ALJ reasonably discounted Mr. Lawson's opinion. (ECF No. 15 at 10-19).

## V.    **Relevant Medical Evidence**

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The medical information most relevant to Claimant's challenges is summarized as follows.

### A. Treatment Records

In early 2009, Claimant reportedly tore his medial meniscus in his right knee while lifting at work. (Tr. at 344, 350). However, in March 2009, Claimant complained of right knee pain for the past five to six weeks, but denied any known injury. (Tr. at 462). His x-rays showed no injury to the knee, but significant synovial effusion. (*Id.*). His knee fully extended and flexed to approximately 110 degrees. (*Id.*). Synovial fluid was drained from his right knee, which promptly relieved most of his knee discomfort. (*Id.*). At the end of the month, his condition was unimproved and he was shown to have recurrent synovial effusion. (*Id.*). An MRI was suggested, but he elected to wait because he did not have insurance. (*Id.*). He was able to squat down and stand. (*Id.*). He was prescribed a course of Medrol DosePak for one week and then instructed to take Aleve. (*Id.*).

The following month, Claimant reported that his knee was still swelling and

popping and snapping. (Tr. at 463). Fluid was again drained from his knee. (*Id.*). His MRI, which was taken in May 2009, showed some degenerative change of the medial meniscus, a questionable horizontal tear, and medial compartment arthropathy. (*Id.*). Synvisc was injected into his knee and he was instructed to take Aleve.[2] (*Id.*). He received a second Synvisc injection that month and fluid was again drained from his right knee. (*Id.*). He received a third Synvisc injection later in May 2009. (Tr. at 464). Claimant was prescribed pain medications, including Lortab, Ultram, and Tramadol. (Tr. at 464-65).

In August 2009, Claimant noted that Synvisc and corticosteroid injections did not offer him relief, so he was prescribed Celebrex. (*Id.*). He had moderate synovial effusion on physical examination with good range of stable motion. (*Id.*). In September 2009, his knee was essentially the same. (*Id.*). In February 2010, he had mild effusion and good range of stable knee motion, but still reported knee pain. (Tr. at 465). He stated that he could not tolerate oral anti-inflammatory medication due to upset stomach, but stated that Ultram offered him some pain relief. (*Id.*). At that time, he did not require surgery. (*Id.*).

In March 2012, Claimant had a neurological consultation with Jeffrey A. Greenberg, M.D., regarding his low back pain. It was noted that he had longstanding problems with degenerative changes of the right knee. (Tr. at 365). He had no major weakness of his legs. (*Id.*). At that time, he was on Cymbalta and Klonopin for anxiety; Tramadol, hydrocodone, and Robaxin for pain; and Ambien for sleep issues. (Tr. at

---

[2] Synvisc-One is an injection to supplement the fluid in the knee to help lubricate and cushion the joint to provide osteoarthritis knee pain relief. See *http://www.synviscone.com/what-is-synvisc-one/synvisc-one-f*aqs.aspx.

10

365). He had normal motor function, sensation, and reflexes in all extremities. (Tr. at 366). He had normal gait and could tandem walk and toe & heel walk without difficulty. (*Id.*).

In August 2012, Claimant had a "3 month check" with Amanda Ross, FNP-BC, at Prudich Medical Center. His pain was controlled with Ultram. (Tr. at 318, 320). He reported numbness in his right leg and foot and abnormal dreams. (Tr. at 319). On examination, there was localized effusion and tenderness on palpation of the medial aspect of his right knee. (Tr. at 320). Pain was elicited by flexion. (*Id.*). The anterior and lateral aspects of his right knee were not tender on palpation and he had no erythema of the legs. (*Id.*). He was continued on Ultram for his right knee pain. (Tr. at 320-21).

In October 2012, Claimant followed up with Ted Webb, PAC, at Southern Highlands Community Mental Health Center, where he began receiving mental health treatment in 2008. Claimant reported to Mr. Webb that he had "been better" and still complained of sleeplessness and constant worry. (Tr. at 373).

In December 2012, Claimant had a routine follow-up appointment with Ms. Neal.[3] He continued to complain of knee pain with activity that was eased by rest. (Tr. at 309). He stated that the trials of naproxen and ibuprofen in the past did not offer him relief. (*Id.*). The examination revealed chronic inflammation of his right knee and his gait and stance showed abnormal weakness. (Tr. at 311). He was continued on the same dosage of Ultram and Celebrex was added to his medication regimen. (Tr. at 312). Later that month, Claimant followed up with Dr. Greenberg. It was noted that two

---

[3] The records reflect that Ms. Ross's surname became Neal.

months had passed since Claimant received cervical facet injections for his neck and right arm pain. (Tr. at 354). He had significant relief and was "overall intact neurologically and getting around without any major problem." (*Id.*).

In January of the following year, Claimant reported to Mr. Webb that his depression was worse, he had no hope, hated life, and was not sleeping well. (Tr. at 372). He noted that he was denied disability benefits. (*Id.*). He saw Mr. Webb again the following month. His diagnoses were recurrent moderate major depressive disorder and generalized anxiety disorder. (Tr. at 371). He interacted well with direct eye contact, but his mood was depressed and anxious with an anxious affect. (*Id.*).

In April 2013, Claimant saw Mr. Webb and stated that he was "no better." (Tr. at 408). He still complained of severe depression and reported no benefit from the multiple medications that were tried. (Tr. at 408). Mr. Webb stated that he would try to maximize the Lamictal dose to see if it would help and if Claimant had no improvement, he should consider electroconvulsive therapy (ECT). (*Id.*). During the visit, Claimant interacted well with direct eye contact, but his interpersonal demeanor expressed hopelessness. (*Id.*). He had a stable depressed mood with sad, flat, but broad affect. (*Id.*). His thought content was appropriate, his insight/judgment was fair, his cognitive functioning was baseline, and his recent and remote memory was good. (Tr. at 409). He was noted to be stable, his medications were renewed, and he was scheduled to return in eight weeks. (*Id.*).

The following month, Claimant had a follow up visit with Ms. Neal. His pain was relieved with Ultram, but it increased with activity. (Tr. at 399). He stated that his right knee often "[gave] way" when he was walking and he had pain when climbing stairs. (*Id.*). His examination revealed swelling in his right knee. (Tr. at 401).

In June 2013, Claimant saw Mr. Webb for a fifteen-minute follow-up office visit. He reported no benefit from medication despite trying multiple combinations of medications. (Tr. at 406). He interacted well with direct eye contact, but his mood was "depressed, stable" and his affect was flat. (*Id.*). His sleep was noted as inadequate and his energy was "worse." (Tr. at 406-07). However, his thought content was appropriate, his insight/judgment was good, his cognitive functioning was baseline, and his recent and remote memory was good. (Tr. at 407).

In July 2013, Claimant had x-rays of his right knee, which were compared to his MRI taken in May 2009. (Tr. at 439). He had no fracture or dislocation, but he had progressive degenerative changes, including moderate to severe medial joint compartment narrowing that appeared "a little worse" than his MRI in 2009. (*Id.*). He followed up on the results during his consultation with orthopedic surgeon B. Levin, M.D., in August 2013. At that consultation, Claimant reported throbbing and burning right knee pain that was a "6" out of "10." (Tr. at 413). He had palpable pain in his right knee and walked with a cane for stability. (Tr. at 414). However, he had no focal neurological deficits.[4] (*Id.*). Dr. Levin noted that Claimant's x-ray showed marked osteoarthritis in his right knee and advised Claimant that he needed a total knee replacement. (Tr. at 414, 415). Claimant said he would "think about [it]." (Tr. at 414). Dr. Levin stated that Claimant could return as needed. (*Id.*).

In September 2013, Claimant had clinical evaluation/assessment at Southern Highlands by Earl Peyton. He reported increased depression and anxiety with agitation. (Tr. at 430). He did not want counseling at that time. (*Id.*). He was oriented

---

[4] Focal neurological deficits may include paralysis, weakness, loss of muscle control, loss or increase in muscle tone, involuntary movements, numbness, or loss of coordination. *See* https://medlineplus.gov/ency/article/003191.htm

in all spheres, had good insight and judgment, appropriate thought content and appearance, but his mood was depressed, although his affect was broad. (Tr. at 431). He stated that his recent memory was poor and his remote memory was good. (*Id.*).

The following month, Claimant saw Ms. Neal for follow up regarding his arthritis and medication refills. (Tr. at 440). He still received some relief from Ultram, but reported that it was "not as good as it used to be." (*Id.*). He was currently taking Buspirone HCl, Cymbalta, Klonopin, Seroquel, and Ultram. (*Id.*). He stated that his right knee "locks up" and "catches." (Tr. at 441). He had effusion and pain elicited by motion in his right knee. (*Id.*). He walked with a cane. (*Id.*).

In November 2013, Claimant saw rheumatologist Syed M. Ahmad, M.D. He reported chronic pain and discomfort over the past 10 years or longer. (Tr. at 416). He stated that his knees usually hurt the most, particularly his right knee with any weight bearing or ambulation. (*Id.*). Dr. Ahmad noted that Claimant's x-ray in July 2013 showed more severe arthritis than his 2009 MRI. (*Id.*). Claimant reported having difficulty performing chores at times due to pain and discomfort in his joints and knees. (*Id.*). He also stated that his lifestyle was mostly sedentary and he gained 20 pounds in the prior six months. (Tr. at 417). Despite Dr. Levin's recommendation for right knee arthroplasty, Claimant "decided to tough out the pain." (*Id.*). Claimant also reported depression, anxiety, and insomnia. (Tr. at 419).

On examination, Claimant's right knee was very painful on flexion and extension. (Tr. at 421). He was able to flex his right knee to 100 degrees. (*Id.*). He had no major swelling of his right knee joint. (*Id.*). His right anserine bursa was markedly tender along the upper medial aspect of the leg, which was suggestive of anserine bursitis. (*Id.*). He was counseled on healthy lifestyle choices, prescribed medications,

and recommended for corticosteroid injections in his right knee and leg. (Tr. at 423-24). He received an injection of depo-medrol and lidocaine in his right knee and right anserine bursal region. (Tr. at 424). He was advised that he would ultimately need a total knee replacement. (*Id.*).

In December 2013, Claimant again saw Dr. Ahmad. He stated that the injection in his right knee helped for a week or so, but the pain returned. (Tr. at 427). Dr. Ahmad noted that Claimant had been using a cane. (*Id.*). Claimant was advised to try a knee brace and quad strengthening exercises. (*Id.*). He needed to see an orthopedic surgeon for further evaluation and probably surgery. (*Id.*). His right knee was painful on flexion and extension with limited mobility. (Tr. at 428). His left knee had adequate range of motion, but was tender. (*Id.*). He was to continue using Ultram, as needed, for pain. (*Id.*).

In March 2014, Claimant saw Mr. Webb. He reported that he felt "absolutely no different" and was still having depressive symptoms and sleep issues, as well as increased pain. (Tr. at 506). Mr. Webb noted that he treated Claimant for several years with multiple medications without much success and Claimant may consider a change in provider. (*Id.*). During the visit, Claimant was cooperative and interacted well. (Tr. at 507).

The following month, Claimant saw Ms. Neal for a "6 month check." (Tr. at 452). For mental issues, he was no longer on Cymbalta and was instead on Fetzima from Southern Highlands. (*Id.*). The "overall findings" of his musculoskeletal examination were normal. (Tr. at 454). He walked with a cane. (Tr. at 455). Claimant scored 24 on a PHQ9, which is a self-administered patient questionnaire used to diagnose mental disorders, demonstrating that he had "clinically significant symptoms" of depression.

15

(Tr. at 455, 456). He was referred to rheumatology for a second opinion in addition to Dr. Ahmad's assessment and his Ultram was refilled. (Tr. at 456).

In May 2014, Claimant followed up with Mr. Webb. He stated that he had no improvement, was still depressed, and that Fetzima provided no benefit. (Tr. at 508). Mr. Webb switched Claimant back to Cymbalta and planned to see him again in two months. (*Id.*). During the visit, Claimant was cooperative and interacted well. (Tr. at 509). Two months later, Claimant stated to Mr. Webb that he still felt the same. (Tr. at 510). He said that Cymbalta kept him from crying, but he worried about his son and had pain and no energy. (*Id.*). He stated that he "knew he had fibromyalgia." (*Id.*). Mr. Webb noted that Claimant had multiple vague complaints and refused counseling due to transportation issues. (*Id.*). However, Claimant was cooperative and interacted well. (Tr. at 511).

Also in July 2014, Claimant saw another rheumatologist, Wassim Saikali, M.D., at the referral of Ms. Neal. Dr. Saikali's impression was that Claimant had osteoarthritis of the knees. (Tr. at 459). Steroid shots were unhelpful, but Claimant reported that the Synvisc shot helped him for two to three months. (*Id.*). Dr. Saikali did not have a lot of options to offer other than giving Claimant an anti-inflammatory medication and offering an injection, as needed. (*Id.*). He stated that Claimant could continue using his cane until he was ready for a knee replacement. (*Id.*). Dr. Saikali also suggested a course of Supartz, but Claimant declined due to his "young age." (*Id.*).

In August 2014, Claimant saw Ruth Rhodes, PA-C. Claimant reported that he was generally sedentary and did fairly well if he did not do anything very active. (Tr. at 475). He had full range of motion in his knees, but crepitus with extension and flexion of his right knee. (*Id.*). He had no effusion in his knees. (*Id.*). Claimant declined Supartz

injections due to his long drive. (*Id.*). Ms. Rhodes did not have much to offer him as most of his symptoms were osteoarthritis and he was already taking Tramadol prescribed by his primary care provider. (*Id.*). He stated that steroids, Synvisc injections, NSAIDs, Lodine, and Neurontin did not help. (*Id.*). He requested Hydrocodone, but Ms. Rhodes declined as she did not provide long-term pain relief at her clinic. During a visit with Ms. Neal the following month, Plaintiff continued to walk with a cane. (Tr. at 469). He had generalized swelling of the knee and pain elicited by motion, but no erythema, warmth, or tenderness on palpation. (*Id.*).

During Claimant's October 2014 appointment with Mr. Webb, Claimant stated that he still felt depressed, although Cymbalta kept him from crying all of the time. (Tr. at 512). He reported that Abilify made him worse. (*Id.*). Mr. Webb planned to continue the current treatment and noted that Claimant should consider changing providers. (*Id.*). Claimant was cooperative and interacted well with Mr. Webb. (Tr. at 513).

In November 2014, Claimant saw Dr. Saikali for follow up regarding his polyarthralgia and osteoarthritis. (Tr. at 477). He reported that he was still in pain all of the time and Ultram was not helping. (*Id.*). The impression was possible small joint inflammatory arthritis, but Claimant had chronic pain syndrome and depression that was making pain management difficult. (Tr. at 478). Dr. Saikali opined that Claimant could go to a pain management clinic. (*Id.*).

### B. Evaluations and Opinions

In March 2013, Rosemary L. Smith, Psy.D., performed a psychiatric review technique based upon a review of Claimant's records. Dr. Smith assessed that Claimant had severe affective and anxiety disorders, which imposed a mild restriction in activities of daily living and moderate restriction in social functioning and

17

concentration, persistence, or pace. (Tr. at 75). She found no episodes of decompensation of extended duration. (*Id.*). Dr. Smith noted that Claimant was in outpatient treatment for major depressive disorder and generalized anxiety disorder and that throughout his medical evidence of record, he interacted well and his memory was fair to good. (Tr. at 76). She found that his mental symptoms were partially credible as the medical evidence of record showed limitations, but not to the severity alleged. (Tr. at 77). She found that his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; interact with the general public; accept instructions and respond appropriately to criticism from supervisors was moderately limited. (Tr. at 79-80). Nonetheless, she opined that he could understand, remember, and carry out 3 and 4-step commands involving simple instructions in an environment that entailed only occasional and superficial interactions with others. (Tr. at 80). Dr. Smith's opinions were affirmed at the reconsideration level of review by John Todd, Ph.D., in September 2013. (Tr. at 104-05, 107-09).

In May 2013, Uma Reddy, M.D., reviewed Claimant's records and opined that Claimant had the RFC for light work with only frequent climbing ramps/stairs and occasional climbing ladders/ropes/scaffolds, balancing, stooping, kneeling, crouching, and crawling. (Tr. at 77-78). He should also avoid concentrated exposure to extreme temperatures, vibration, and hazards. (Tr. at 78). Dr. Reddy found that Claimant's physical complaints were partially credible, noting that he was on pain medications and he had no neurological deficits and his gait was "okay." (Tr. at 77, 79). Dr. Reddy noted that Claimant previously applied for social security benefits and was adjudged by an ALJ to be not disabled by decision dated October 18, 2012. (*Id.*). A. Rafael Gomez,

18

M.D., affirmed the physical RFC as written in September 2013. (Tr. at 107-08).

In November 2013, Claimant had a general physical examination by Ms. Neal and Ronald Billips, M.D., for the West Virginia Department of Health and Human Resources. Claimant used a cane and walked with a limp. (Tr. at 444). He reported numbness that extended from his right knee to his foot, as well as pain and restricted range of motion in his right knee. (Tr. at 445). He had a flat affect. (*Id.*). His major diagnoses were depression and joint pain and his minor diagnoses were anxiety and abdominal pain (IBS). (*Id.*). Ms. Neal and Dr. Billups opined that Claimant could not work full-time at his customary job or at a similar occupation, because he could not stand for extended periods of time. (*Id.*). They were unsure if he could work at any other job on a full-time basis. Ms. Neal completed a "Physician's Summary" form, stating that Claimant's diagnosis was joint pain, which was stable. (Tr. at 447). She indicated that it was "unknown" how long his incapacity/disability was expected to last. In terms of employment limitations, she advised that Claimant should avoid extended standing and heavy lifting. (*Id.*).

In November 2014, licensed clinical psychologist David Lawson, M.A., performed a single psychological evaluation of Claimant and thereafter completed a Mental Impairment RFC Form. Mr. Lawson evaluated that Claimant had social anxiety disorder, persistent depressive disorder, generalized anxiety disorder, mild amphetamine use that was in remission, and borderline intellectual functioning. (Tr. at 486). He opined that Claimant was not a malingerer. (Tr. at 487). Claimant's psychological symptoms were noted to be sleep and mood disturbance, anhedonia, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, decreased energy, and generalized

persistent anxiety. (*Id.*).

Mr. Lawson believed that Claimant's scores on the Minnesota Multiphasic Personality Disorder test, Second Edition, and Wechsler Adult Intelligence Scale, Fourth Edition, supported his diagnoses and reported symptoms. (*Id.*). He opined that Claimant had a poor prognosis, his impairment was expected to last at least 12 months, he would be anticipated to miss work more than three times per month, and he would have difficulty working even a simple, routine job on a sustained basis.  (Tr. at 488). Mr. Lawson felt that his mental issues would result in decreased performance and frequent absences and his low intellectual functioning would limit the availability of sedentary jobs that Claimant could perform. (*Id.*).

Mr. Lawson found that Claimant had marked restriction in activities of daily living and social functioning and moderate restriction in concentration, persistence, or pace and episodes of decompensation. (Tr. at 489). In terms of social functioning, Claimant reported that he lost interest in all past hobbies and only saw his sister and talked to his son occasionally; otherwise, he did not go anywhere or do anything. (Tr. at 495). In terms of daily activities, he showered once or twice per week, cooked simple meals, went grocery shopping, watched television, communicated over the phone or text message, and washed dishes and clothes, although these activities took a while because of his pain. (Tr. at 495). He usually slept from two or three in the morning until three in the afternoon. (*Id.*). During the day, he sat on the couch and watched television, ate, and then went to bed. (*Id.*). He used a cane for ambulation and his gait was slow with a stiff posture. (Tr. at 496). His speech and orientation were normal, but his mood was dysphoric with congruent affect. (*Id.*). His insight was fair, judgment was moderately deficient based on his WAIS-IV comprehension subtest scale score of 5, his

immediate and remote memory and concentration were within normal limits, but recent memory was moderately deficient based on his ability to recall 2 out of 4 items after 30 minutes. (*Id.*).  His full scale IQ score was 80, which fell within the borderline range of intellectual functioning. (Tr. at 497). His results on the Miller Forensic Assessment of Symptoms Test, which is a screening aid to detect malingering or intentional feigning of symptoms, lent veracity to his reported symptoms. (Tr. at 502).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

# VII.   Discussion

### A. Mental Impairments

Claimant contends that the ALJ failed to consider all of the relevant evidence of record concerning his mental impairments; improperly discounted the opinion of Mr. Lawson; provided contradictory rationale and findings; and generally failed to provide a sufficient explanation for his evaluation of Claimant's mental impairments. The undersigned agrees with Claimant's contentions.

At step two of her analysis, the ALJ found that Claimant suffered from severe depression and anxiety. (Tr. at 15). In support, she relied upon "the evidence discussed hereunder" in her decision. The ALJ subsequently evaluated and rated Claimant's degree of limitation in the four key functional areas. She concluded that Claimant had mild restriction in activities of daily living, citing that he could care for himself and perform daily tasks without assistance from others. (Tr. at 16). She found that Claimant had moderate difficulty in social functioning, noting that Claimant had limitations in terms of interacting with others, but could accept instruction in order to perform simple tasks. (*Id.*). With respect to maintaining concentration, persistence, or pace, the ALJ determined that Claimant had moderate limitation, pointing out that Claimant showed normal concentration with no significant limitations at his November 2014 psychological testing. (*Id.*). Finally, the ALJ concluded that Claimant experienced no episodes of decompensation of extended duration. (*Id.*).

The ALJ then analyzed Claimant's credibility and RFC. The ALJ noted that at Claimant's mental health evaluation in September 2013 at Southern Highlands, he was oriented times four and had good insight and judgment; also, he had appropriate thought content and appearance and although his mood was depressed, his affect was

broad (normal). (Tr. at 17). The ALJ also discussed the observations and results of Claimant's psychological examination by Mr. Lawson in November 2014. (Tr. at 18). After consideration of the evidence, the ALJ stated that she did not find Claimant's alleged symptoms to be fully credible. (*Id.*). As to his mental impairments, the ALJ found that while Claimant had symptoms of depression and anxiety, he did not require any hospitalizations and responded to therapy with only moderate symptoms. (Tr. at 18). Further, the ALJ found that Claimant was able to maintain his daily activities and interact appropriately with others. (*Id.*). The ALJ did not reference any portions of the record that supported these conclusions. The ALJ then gave little weight to Mr. Lawson's opinion, which included that Claimant would have difficulty working even a simple routine job due to excessive absenteeism and other factors. (*Id.*). The ALJ stated that she afforded little weight to Mr. Lawson's opinion on the basis that it "was not provided by an acceptable medical source nor [was] it supported by the objective medical evidence in [the] file." (*Id.*). Ultimately, the ALJ restricted Claimant's RFC to simple tasks with no public interaction and only occasional interaction with coworkers and supervisors. (Tr. at 16).

The ALJ's analysis of Claimant's mental impairments is flawed in several respects. To begin, the ALJ simply ignored records that were inconsistent with her conclusion and never attempted to reconcile the inconsistencies. For instance, contrary to the ALJ's statement, Claimant's mental health treatment records contain multiple entries indicating that he was not responding to his current therapy. (Tr. at 406, 408, 410, 430, 434, 506, 508, 510, 512). In fact, his response was so poor that his mental health care providers considered using electroconvulsive therapy and contemplated referring Claimant to new care providers who might be able to offer a different

approach. (*Id.*). In addition, other records from Southern Highlands document that Claimant suffered from daily dysfunction in task performance and interpersonal relationships. (Tr. at 432, 436). The ALJ never discussed these entries, identified contradictory entries in the record, or explained why contradictory entries were entitled to more weight.

Next, the ALJ failed to provide an acceptable explanation for the weight she gave to Mr. Lawson's medical source statement. Mr. Lawson performed a comprehensive mental health examination of Claimant and determined that Claimant had moderate and marked functional limitations secondary to his mental impairments; that he would be absent more than three times per month; and that he would have difficulty working at even a simple routine job. (Tr. at 488-89). The ALJ acknowledged these opinions, but rejected them on the basis that Mr. Lawson was not an acceptable medical source. As the Commissioner concedes, the ALJ's rationale in this regard was incorrect. Given that a licensed clinical psychologist, such as Mr. Lawson, is an "acceptable medical source," under the applicable social security regulations, the ALJ's decision to afford little weight to Mr. Lawson's opinion on that ground was clear error. 20 C.F.R. §§ 404.1502(a)(2), 416.902(a)(2).

The Commissioner argues that this error was harmless, however, because the ALJ provided a second reason for discounting Mr. Lawson's opinion. As the Commissioner emphasizes, the ALJ also accorded little weight to Mr. Lawson's opinion on the basis that it was not supported by "objective medical evidence" in the file. (Tr. at 18). While the Commissioner is correct that a second reason was offered, the ALJ failed to indicate which evidence was inconsistent with Mr. Lawson's opinion. Indeed, it is not readily apparent from the decision which specific portions of Mr. Lawson's

opinion were given little weight and why the ALJ rejected them. The ALJ evidently gave some credence to the results of Mr. Lawson's psychological testing, because she relied on them. (Tr. at 18). To the extent that the ALJ disagreed with Mr. Lawson's other findings, the ALJ should have explained the reasons for the disagreement by pointing to the evidence that contradicted Mr. Lawson's conclusions and, in turn, supported the ALJ's RFC finding. Clearly, the evidence pertaining to Claimant's mental impairments is not so uniform and one-sided that such an explanation is unnecessary.

Moreover, the ALJ included some limitations in Claimant's RFC related to deficits in mental functioning, but never explained the evidentiary basis of those limitations, leaving the Court to speculate as to the reasons for the restrictions. Therefore, the ALJ's analysis of Claimant's mental impairments is "incomplete and precludes meaningful review." *Monroe v. Colvin*, 826 F.3d 176, 191 (4th Cir. 2016) (finding that the ALJ supplied insufficient reasoning to assign limited weight to consultative examiners' opinions by stating that "the objective evidence or the claimant's treatment history did not support the consultative examiner's findings," but not specifying what "objective evidence" or what aspects of the "treatment history" to which he was referring); s*ee also Fox v. Colvin*, 632 F. App'x 750, 756 (4th Cir. 2015) (finding that the ALJ's "cursory and conclusory" explanation for assigning "less weight" to the physician's opinion prevented meaningful review of the administrative decision, stressing that the ALJ failed to explicitly discuss how the physician's opinion was inconsistent with other medical findings) *and Lewis v. Berryhill,* --- F.3d ----, 2017 WL 2381113, at *6 (June 2, 2017) (reiterating that "[a] necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling," including "a discussion of which evidence the ALJ found credible and why, and specific application

of the pertinent legal requirements to the record evidence.") (citation omitted). As the Fourth Circuit has repeatedly explained, "the residual functional capacity 'assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).' *Id.* (*citing* SSR 96-8p, 1996 WL 374184, at *7).

Overall, the ALJ's analysis of Claimant's psychological evidence is cursory and wholly inadequate. While an ALJ is not obligated to comment on every piece of evidence presented, the decision must "contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating [his or her] determination and the reason or reasons upon which it is based." *Haught v. Colvin*, No. 2:15-CV-99, 2017 WL 417201, at *5 (N.D.W. Va. Jan. 31, 2017) (internal quotations and citations omitted). Here, the ALJ does not reference or discuss the vast majority of Claimant's mental health treatment records. In addition, the two records that she does reference, which include a clinical evaluation/assessment that was performed by a licensed social worker in September 2013 and Mr. Lawson's psychological evaluation and testing in November 2014, do not correlate with or provide explicit support for her findings as to Claimant's mental impairments. For instance, as noted, the ALJ found that Claimant had moderate restriction in maintaining concentration, persistence, or pace. The only evidence cited by the ALJ in support of that finding was Mr. Lawson's observation that Claimant's concentration was intact. Consequently, the evidence identified by the ALJ as supportive of her finding was, on its face, inconsistent with the finding.

26

The ALJ ultimately restricted Claimant's RFC to simple tasks with no public interaction and only occasional interaction with coworkers or supervisors. She provides no rationale for those limitations, nor does she explain how restricting Claimant to simple tasks accounts for his moderate limitation in maintaining concentration, persistence, or pace. *See Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015) (A restriction to simple, routine tasks or unskilled work does not account for moderate deficiency in concentration, persistence, or pace; an ALJ must either include limitations in the RFC to address such functional deficit or explain why such limitations are not warranted). While the state agency experts found that Claimant could understand, remember, and carry out 3 and 4-step commands involving simple instructions in an environment that entailed only occasional and superficial interactions with others, the ALJ did not expressly reference or rely on such opinions in her decision. Assuming the agency experts' opinions provided grounds for the mental limitations contained in the RFC, the ALJ should have addressed the timing of the opinions and whether the opinions were consistent with other evidence in the record. Notably, the first agency expert reviewed Claimant's case in March 2013, which was months prior to Claimant's amended date of disability onset. The second expert affirmed the prior opinion of the first expert only a month after the alleged onset date. (Tr. at 75-77, 79-80, 104-05, 107-09). Accordingly, neither agency expert had the benefit of reviewing many of the relevant treatment records or Mr. Lawson's comprehensive evaluation.

In sum, the ALJ's decision does not provide a sufficient analysis of the relevant evidence, the weight that she assigned to the evidence, and the rationale for her conclusions. Therefore, the undersigned **FINDS** that the ALJ's assessment of

Claimant's mental impairments is not supported by substantial evidence.

### B. Knee Impairment

Claimant next argues that the ALJ's analysis of his right knee impairment was "grossly deficient." (ECF No. 14 at 17). Claimant first contends that the ALJ's finding that injections improved his pain and range of motion is "incomplete and misleading" because those improvements "were of limited duration, lasting at most a couple of months." (ECF No. 14 at 17). Therefore, Claimant posits that there is no evidence that the solution which the ALJ relied upon to discount Claimant's knee impairment would afford him relief on an ongoing basis sufficient to conclude that he could perform "ongoing, long-term work activities." (*Id.*). Further, Claimant argues that the ALJ erred in not referencing the fact that three specialists opined that he required a total knee replacement or the fact that he used a cane. (*Id.* at 17-18).

In the decision, the ALJ found at step two that Claimant's osteoarthritis in his right knee was a severe impairment. (Tr. at 15). In evaluating Claimant's RFC, the ALJ noted that at Claimant's surgical consultation in August 2013, Claimant had palpable pain in his right knee, but no neurological deficits and his x-ray showed that he had arthritis. (Tr. at 17). The ALJ also discussed that later in 2013, Claimant continued to complain of right knee pain when weight bearing or ambulating. (*Id.*). Nevertheless, he could flex his knee to 100 degrees before it caused pain and there was no major swelling. (*Id.*). The ALJ stated that Claimant underwent knee injections, which elicited improvement in his pain and range of motion. (*Id.*). The ALJ also noted Claimant's evaluation in August 2014 during which he had full range of motion of both knees and although he had some crepitus in his right knee, he had no effusion. (Tr. at 18).

Overall, the ALJ found that the evidence supported that Claimant could stand/walk for 6 hours in an 8-hour workday "based on his treatment and response to injections, with good range of motion of the lower extremities and normal strength." (*Id.*). Therefore, the ALJ assessed that Claimant could perform light work as defined in the regulations with additional postural limitations, including frequent climbing stairs and occasionally climbing ladders, balancing, and crawling. (Tr. at 16).

The ALJ's sparse analysis of Claimant's knee impairment selectively focuses on certain evidence, while omitting contrary information. Most critically, the ALJ's decision does not reflect any consideration of the November 2013 treating source opinion from Ms. Neal and Dr. Billups, in which they explained that Claimant could not stand for extended periods due to knee pain. Ms. Neal and Dr. Billups, who had treated Claimant's knee impairment for a number of years, opined that Claimant was incapable of both prolonged standing and heavy lifting. (Tr. at 445). As discussed below, the ALJ was required to address this opinion as it fundamentally conflicted with her finding that Claimant could stand or walk for 6 hours in an 8-hour workday and, as such, could perform light level exertional work. *See* 20 C.F.R. §§ 404.1567(b); 416.967(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.")

Title 20 C.F.R. §§ 404.1527(c), 416.927(c) outlines how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for DIB and SSI benefits. In general, the ALJ should give more weight to the opinion of an

examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2). A treating physician's opinion on the nature and severity of an impairment may be afforded controlling weight when the following two conditions are met: (1) the opinion is well-supported by clinical and laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). When a treating physician's opinion is not supported by clinical findings, or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight. *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). The ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5 (1996). "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected … In many cases, a treating source's opinion will be entitled

to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* at *4. On the other hand, when there is persuasive contrary evidence in the record, a treating physician's opinion may be rejected in whole or in part. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Generally, the more consistent a physician's opinion is with the record as a whole, the greater the weight an ALJ will assign to it. 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner, however, are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (1996). In SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;

2. What an individual's RFC is;

3. Whether an individual's RFC prevents him or her from doing past relevant work;

4. How the vocational factors of age, education, and work experience apply; and

5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special

31

significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

Here, the ALJ did not acknowledge, much less weigh, the treating source opinion that conflicted with her RFC finding as to Claimant's ability to perform light work. This error, alone, warrants remand. *See, e.g., Lewis,* 2017 WL 2381113, at *7 (finding that the ALJ failed to adequately explain his decision not to give the opinions of the claimant's treating physicians "controlling weight" under 20 C.F.R. § 404.1527(c)(2) and § 416.927(c)(2)). Similarly, not having given the treating source opinion controlling weight, the ALJ should have weighed the other opinions in the record. However, the ALJ failed to discuss and weigh any of the other medical source statements; most notably, the opinions of the agency consultants.

The ALJ's circumscribed discussion of the medical evidence presents a skewed analysis of Claimant's treatment. The ALJ found that Claimant "underwent some knee injections with improvement to both his pain and range of motion." (Tr. at 17). However, the records reflect that while Claimant reported that a Synvisc shot helped him for two or three months, he also reported receiving no relief from other injections, having constant pain, his legs "giving out" and buckling, and that he lived a generally sedentary lifestyle. (Tr. at 413-15, 421, 427, 440, 459, 469, 475, 477). Furthermore, the ALJ's decision does not even mention the fact that Claimant walked with cane and

three separate physicians, including an orthopedic surgeon and two rheumatologists, opined that he should undergo a total knee replacement. (*Id.*). While the ALJ might have been able to reconcile and distinguish all of the available evidence in the record, her decision fails to provide such explanation and this Court is precluded from performing the analysis in the first instance. *See Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir. 2013) (Reviewing courts should not reweigh conflicting evidence, make credibility determinations, or substitute judgment for that of the ALJ).

Therefore, for all of the reasons stated above, the undersigned **FINDS** that the ALJ's decision as to Claimant's right knee impairment is likewise unsupported by substantial evidence.

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's motion for summary judgment, (ECF No. 13), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 15); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the

parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** June 15, 2017

Cheryl A. Eifert
United States Magistrate Judge

34